**UNDER SEAL**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA

v.

MELVIN PALMA FLORES,

Defendant.

Case No. 1:20-MJ-74

**Filed Under Seal**



FILED
FEB 13 2020
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Josef N. Matzke, a Detective with the Fairfax County Police Department's Organized Crime and Narcotics unit, state as follows:

### INTRODUCTION AND OFFICER BACKGROUND

1. I have more than thirteen years of experience as a sworn officer of the Fairfax County Police Department and am currently a member of the Fairfax County Organized Crime and Narcotics unit assigned as a task force officer to the United States Drug Enforcement Administration (DEA). During my time in law enforcement, I have participated in the application for and execution of numerous arrest and search warrants in the investigation of narcotics and organized crime related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, and other evidence of criminal activity.

2. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. I have gained knowledge in the use of various investigative techniques including the use of physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial

investigations, and the execution of search and arrest warrants. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled dangerous substances. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3. I make this affidavit in support of an application for a criminal complaint and arrest warrant charging Melvin Palma Flores (FLORES) with possession of a firearm in furtherance of a drug trafficking crime, and that death resulted from such possession, in violation of Title 18, United States Code, Sections 924(c) and 924(j).

4. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and observations of other law enforcement officers and agents involved in this investigation. All observations referenced below that were not personally made by me were related to me by the persons who made such observations. This affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me or known to the government.

## PROBABLE CAUSE

5. The Fairfax County Police Department (FCPD), with the assistance of the DEA, is investigating a murder that occurred on or about October 26, 2019, in Fairfax County, Virginia.

6. On October 26, 2019, officers from the Fairfax County Police Department responded to an apartment complex in Alexandria in reference to a shooting. Officers located a male victim, hereinafter referred to as "XB." XB had sustained a gunshot wound to his upper body and was transported to the hospital, where he subsequently died. The gunshot did not appear to be self-inflicted. An autopsy was performed, and the manner of death was ruled a homicide.

7. In the course of the investigation, FCPD Homicide detectives learned that on or about October 25, 2019—the day before the shooting—XB contacted FLORES and asked to purchase some marijuana from FLORES. This was a ruse to lure FLORES out of his residence in order to rob him of his marijuana. At approximately 3:00 pm, XB rode to FLORES's house with three other individuals. Two of those individuals met with FLORES and stole the marijuana instead of purchasing it, while XB stayed in the car.

8. Based on my training and experience, I know that this situation is commonly referred to as a "drug rip." A "drug rip" refers to stealing drugs from a source of supply. Often drug rips are set up by arranging to purchase narcotics; however, the supposed customer does not intend to pay, and instead either takes or forcibly removes the narcotics from the supplier. In response to the "drug rip," the supplier may resort to violence and intimidation towards adversaries and subordinates in order to maintain control over the illegal activity in which he/she is involved.

9. A witness (W-1) stated that during the drug rip, FLORES pulled out a semi-automatic handgun from his waistband, hesitated, and then put the handgun back in his waistband and walked bank into his house.

10. XB's girlfriend advised law enforcement that she had heard rumors that XB and FLORES had been communicating through social media and that XB had been taunting FLORES about FLORES not using the gun to defend himself. Records from Snapchat show that FLORES and XB had some communications throughout the afternoon of October 25, though I know that Snapchat communications are not always preserved. At around midnight, XB posted a Snapchat video of himself in which he states, "You won't, n-----. Stop cappin', n-----." I understand "stop cappin'" to be slang for "stop lying." Based on my knowledge of the investigation and the larger context of FLORES's and XB's interactions earlier in the day, I believe XB was taunting FLORES and stating that FLORES would not come after him in retaliation for the drug rip. The first 911 calls reporting the shooting started coming in around 30 minutes later.

3

11. XB's grandmother advised law enforcement that XB was home with her leading up to the homicide. XB's grandmother stated that XB received a call on his cell phone and walked out of the residence. XB never returned.

12. The day after the shooting, a FCPD Homicide detective communicated with FLORES on his cell phone. A search warrant was obtained for the historical cell site location information (CSLI) associated with FLORES's cell phone. The CSLI shows that the phone FLORES used traveled near the homicide location just prior to the time investigators believe the homicide occurred, and then left the area of the homicide when emergency services began receiving 911 calls reporting the shooting.

13. FCPD detectives interviewed another witness (W-2), who stated that FLORES's girlfriend drove FLORES and another male to XB's apartment complex and parked along the street just north of XB's building, where his body was found. FLORES exited the vehicle and walked out of sight. W-2 heard gunshots and then FLORES returned to the vehicle holding a gun. FLORES and the other two individuals then departed the area in the vehicle. CLSI for W-2's cell phone places it in the area of the homicide during the timeframe that the homicide is believed to have occurred. This cell phone then follows the same path away from the homicide scene as FLORES's cell phone.

14. FCPD detectives interviewed a third witness (W-3) after finding that W-3's Snapchat account was in contact with XB's Snapchat account just prior to the homicide. A review of communications on the social media platform Snapchat shows that XB was in contact with W-3's Snapchat account at approximately 12:25 am on October 26. The first 911 calls came in just minutes later.

15. W-3 confirmed that FLORES rode in a vehicle with his girlfriend and another male to XB's apartment complex. W-3 also stated that the vehicle parked on the side of the road and FLORES exited the vehicle and walked out of sight. A short time later, W-3 advised that W-3

also heard gunshots, and then FLORES returned to the vehicle. W-3 stated that the vehicle departed and that once out of the area, FLORES got rid of the clothes he had been wearing.

16. FCPD detectives were also advised that FLORES disposed of the firearm used during the homicide by dismantling it and placing its components in different locations.

## CONCLUSION

17. Based on the foregoing, I submit that there is probable cause to believe that, in furtherance of a drug trafficking offense, MELVIN PALMA FLORES did knowingly possess a firearm, and that the death of a person resulted from the use of such firearm, in violation of Title 18, United States Code, Section 924(j)(1).

Respectfully submitted,

_____
Josef Matzke
Task Force Officer
Drug Enforcement Administration

Sworn and subscribed to before me this 13th day of February, 2020.

_____/s/_____
John F. Anderson
United States Magistrate Judge
The Honorable John F. Anderson
United States Magistrate Judge

5